The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner of formal business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. All right, have a seat, please. All right, the first case we're going to hear this morning is Anderson v. Crouch, and Mr. David will hear from you. Good morning, Your Honors. May it please the Court. Neither federal statutes nor the Constitution compel states to fund sex reassignment surgeries. The District Court erred when it found otherwise, and Scrimetti makes clear the District Court's error. Classifications that hinge on medical use don't turn on sex, so those classifications only need to satisfy rational basis review. Scrimetti tells us that cost, efficacy, and safety concerns satisfy that rational basis. And because medical use classifications don't turn on sex, they also don't violate the Affordable Care Act's anti-discrimination provision. Scrimetti answers that question, too. And finally, Scrimetti does speak to the Medicaid Act, even if indirectly. There's nothing in federal law that requires state Medicaid programs to cover gender-affirming surgeries. The Medicaid Act just requires states to establish reasonable standards for determining the extent of medical assistance provided to beneficiaries. Scrimetti counsels deference to states when determining the best course of action on public health issues. Are you maintaining that under the Medicaid Act, the standard we should be applying is a reasonable standard, and then we can look at Scrimetti's to what's reasonable? Yes, Your Honor, and so the Medicaid Act specifically requires states to have reasonable standards for the extent of the medical assistance that they are going to provide. And those reasonable standards are tied to the objectives of the Act, and the objectives of the Act are to provide the greatest amount of benefits to the largest number of people. And so within the Medicaid Act, there are also, there's the availability requirement, there's the comparability requirement. The availability requirement requires the states to determine the reasonableness of what they're actually providing within the realm of what is practicable. And states have different levels of practicability because they have different levels of funding available to them. And also, the objectives change per each state because states have different populations. They have different health needs within those populations. So what might be reasonable for one state may not be the best course of action or the most reasonable thing for another state. And so reasonableness and rational basis are used pretty interchangeably throughout this court's precedence, also through the Supreme Court's precedence. So yes, that is how we are saying that Scrimetti indirectly speaks to the Medicaid Act. Can I ask a predicate question here? Sure. Why is there a private cause of action after Medina under the Medicaid Act? Your Honor, I think that after Medina, there is a very good argument that we have not had a chance to take to the district court. But I think there is a very, very good argument after Medina that there is no private cause of action because this is spending clause legislation. I mean, it's the same statute. I mean, it's not like a very good argument. It's the very same statute that's in Medina, right? It's the same Medicaid statute. It's the same spending clause. Like everything in Medina seems to apply here, right? I mean, I understand you haven't made the argument, but it's the predicate question, right? You're asking us to decide how to apply the Medicaid Act, but it sort of seems like an odd scenario for us to be interpreting the Medicaid Act in an instance where, like, after Medina, it seems plainly obvious that there's no private cause of action. I think that that's correct, Your Honor. And just respecting the procedural rules, we didn't go down that road because we had not briefed that at the district court and because this court had not asked us to apply that. Well, you can always – I mean, pre-Medina, there was a cause of action because our court in the Planned Parenthood cases had said that there was. Yes. Right? But post-Medina, and so once the new Supreme Court decision came out, it didn't limit you from raising it. It certainly doesn't limit us from addressing it as a predicate legal question. The parties can't agree that a cause of action exists and force us to answer how it applies, right? We have to construe the law first to determine what the analysis is here. Correct, and we think that post-Medina that there is no cause of action under the Medicaid Act. It's dealing with the exact same provisions, but even if there is one, we still don't think that there is a violation of the Medicaid Act or any of its accompanying regulations. To briefly address equal protection because we believe that Scarametti does directly answer this question, heightened scrutiny isn't triggered when a state regulates a medical procedure that only one sex can undergo. Rather, when a program doesn't exclude an individual from benefit eligibility because of the individual's sex but only removes one condition from the list of covered services, that's not a violation of the Equal Protection Clause. And that's exactly what West Virginia's transsexual surgery exclusion does. That's how it operates. Sex doesn't come into the equation. Transgender status does not come into the equation. The state doesn't ask whether a beneficiary is transgender or not. Transsexual surgery isn't covered for any Medicaid beneficiary regardless of sex or transgender status. It only classifies on the basis of medical use. So the only relevant question when looking at whether something is covered in this instance is, what is the procedure's medical use? If it's for treatment of gender dysphoria, then it's not covered. If it's for something that is within the list of covered services, for instance, breast cancer, it is covered regardless of the patient's sex or gender identity. And because it doesn't turn on sex, there's no risk from which men are protected and women are not, and there's no risk from which women are protected and men are not. The record also lacks any evidence of invidious discrimination. Plaintiffs only point to an absence of a reason that the exclusion was initially adopted over 20 years ago. That's not evidence of animus, and plaintiffs haven't pointed to any evidence. They make this argument, and I'm not sure that's totally true. That's not the only thing they point to. They also say, it seems like to me in the supplemental briefing, that there's a disparate impact and that anywhere that there's a disparate, I'm paraphrasing obviously, but anywhere that there's a disparate impact, we should assume intentional discrimination or that that is evidence of pretext or intentional discrimination. What's wrong with that argument? What are they missing there? They're missing what the Supreme Court held in Personnel Administrator v. Feeney, which is that discriminatory impact is not sufficient because the question is whether there's a discriminatory motive. It's much like all of the other tests that we talk about in this. It's whether it's something that is done because of the effect that it will have on a class or in spite of whether it's going to have that effect. They have to actually show that there was an intent to cause an adverse effect on transgender people, and that's what the Supreme Court told us in Personnel Administrator v. Feeney and all of the cases that came after that. The district court had that same mistaken belief that just because you point to the fact that there is potentially an adverse effect on a certain group of people, that that means that there is an intent, but that's not the question. It's whether there was a discriminatory motive. They have no evidence of that. To the contrary, there's evidence that suggests that West Virginia does not have a discriminatory animus, the first being that they cover all gender-confirming care up to but not including gender-affirming surgery. So that would be a really odd choice for them to say you can have counseling, psychotherapy, psychiatric visits, hormones, lab work, and we're providing all of that based on a discriminatory animus. It just simply doesn't make sense. And it also doesn't follow whenever there is a rational basis. So that's the other part of Personnel Administrator v. Feeney, and that's why this isn't like the tax on yarmulkes in Bray, is that there is a reason that you can look at, and it's the safety and efficacy concerns and the cost concerns that West Virginia has. And our record described deficits that West Virginia was facing budgetarily, but the record also shows that there is a dispute, not just in our record, but worldwide about the safety and efficacy of these treatments. Scrimetti talked about the growing number of European countries that have stepped back from providing this type of care because of safety and efficacy concerns. And plaintiffs point to the inter-qual guidelines that the state uses for determining medical necessity, but all of those guidelines are in the record. This is particularly from JA 970. For every single gender affirmation surgery that's in these guidelines, it states that although there are many publications on gender affirmation surgery, most articles are observational case studies, have less than 30 participants, do not have strong evidence, or are focused on surgical technique. There is a paucity of published evidence that is adequately powered or designed to allow definitive conclusions on safety and efficacy of the individual surgical procedures. Even those guidelines say that there isn't good evidence here, that there isn't enough evidence to show that these are efficacious procedures. So West Virginia makes a reasonable choice when it says we're not going to earmark hundreds of thousands of dollars per procedure. Is there any line that you think should be drawn? I mean, obviously, in an instance, maybe at least hypothetically here, where there is uncertainty about the line of the efficacy of these types of procedures, but is there a line where the legislature could no longer make that choice? The mere existence of any dispute, would that warrant sort of deference to legislative judgment? So imagine, counterfactually, that the overwhelming evidence actually supported the efficacy of a given type of treatment. You know, bone marrow transplants, right? And forget the cost aspect of this. I just mean on pure efficacy grounds. But there's one guy who has a paper that suggests that the bone marrow transplant is not an effective intervention. Could the legislature rely on that one person against the weight of the evidence and still get deference from us on this type of a question? I think they could. And I think that the reason that they could is because it's not drawing any discriminatory lines. And that, of course, would allow for, for instance, if there is a group of people that feel that they are not getting the health care that they need because, for instance, the legislature is looking specifically at this one person that everyone's kind of cast aside, that's a question for the political process for those folks to replace the people that are making those decisions. But the decisions are still entitled to some deference from courts because they are the ones that are asked and tasked with exercising that discretion under the Medicaid Act, the Affordable Care Act, and also Equal Protection. They are the ones that are allowed to draw those lines and provide the rational basis. And I want to move to the Affordable Care Act, which incorporates Title IX's prohibition on sex discrimination. And Title IX, in turn, forbids discrimination on the basis of sex. And that language is important for two reasons. First, Scrimeti said that mere reference to sex doesn't create a sex-based classification, and that's especially true in the medical context because some medical procedures are bound up in sex. So courts are tasked with determining the function of the words or labels, not just noting whether policy refers to sex. And that's particularly important here because this exclusion, as I just discussed, operates based on medical use. That's the only question that's asked. That's the only operative question. What is the medical use of this procedure? If it's to treat gender dysphoria, it's not covered. If it's to treat something else that is within the list of covered services, then it is covered. The second reason that Title IX's language is important is because it refers to a biological binary. So the Supreme Court recently confirmed that meaning in Department of Education v. Louisiana, and also text and history confirm Title IX referring to sex as referring to a biological binary. The Supreme Court in Frontiero, a year after Title IX was passed, said that sex is an immutable characteristic determinant of birth. And that is important because Title IX's definition of sex does not include gender identity. So we end up right back where we were with Scrimeti and with Gdaldig. The exclusion doesn't turn on sex. There's no risk from which men are protected and women are not. There's no risk from which women are protected and men are not. And the exclusion does not treat one sex worse than the other or one better than the other. So it doesn't violate Section 1557. Talk about how you think our precedent on these issues plays in. Sure. So plaintiffs point to Grimm, and Grimm looks at Title IX through the lens of Title VII, and it applies Bostock. So Grimm looks at it in really two aspects. First, Title IX says you can't treat one sex worse than the other. And then it looks at Bostock and says that the Bostock analysis is what should apply here. And Scrimeti doesn't say whether Bostock can go beyond Title VII. It may question that, but it doesn't make the decision. But Scrimeti applied Bostock's analysis just the same and said— So just to make sure I'm understanding, you agree Grimm controls us on the question of what Title IX requires. Yes. That requires that we apply Bostock or Bostock. I have no idea what it is. And then your point is at that point we then look to Scrimeti because Scrimeti sort of in the alternative explained how to apply Bostock in this context. Specifically in the context of medical use, and that's what we have here. So the Bostock test is a traditional but-for-causation test. You change one thing at a time and see if the outcome changes, and if it does, then you found the but-for-cause. And here a hypothetical application of that reasoning to West Virginia's exclusion shows that, again, that it just doesn't turn on sex. So if a transgender man seeks a mastectomy to treat his gender dysphoria, the exclusion would prevent him from receiving coverage. But if you change his biological sex from male to female, the exclusion would still not permit him coverage because he doesn't have a qualifying diagnosis. But if he does have a qualifying diagnosis, he could obtain the mastectomy regardless of his sex or transgender status. So neither sex nor transgender status is the but-for-cause of the inability to get that coverage. The only but-for-cause is the medical use. And the en banc 11th circuit reached the exact same conclusion in Lang v. Houston County. There they looked at whether Title VII required an employer-provided health care plan to pay for, quote, male-to-female sex change surgery. And the answer was no. And the court applied Schermetti's read of Bostock and found that there was no sex discrimination despite the fact that male, female, and sex, all three of those words appear on the face of the policy. And the result should be the same here because West Virginia's policy draws a line between certain treatments which it covers and other treatments which it doesn't. And neither the Affordable Care Act, Title IX, Title VII, or Bostock prohibit that line drawing. We've talked a little bit about the availability requirement, so I want to talk quickly about the comparability requirement for the Medicaid Act. That doesn't come into play here at all. The comparability requirement doesn't require a program to provide a surgery that may kind of roughly look like another surgery. That's the plaintiff's argument here. But what it actually requires is that there's no discrimination within the group of categorically needy, within the group of medically needy, and you can't treat medically needy better than categorically needy. That doesn't come into play here at all. And I see that my time is up. Thank you. Thank you, Mr. David. All right, Mr. Gonzales. Pagan. Good morning, your honors. May it please the court. Omar Gonzales Pagan for the plaintiff and the class. Your honors, this court can affirm the district court's judgment below solely on any one of the statutory claims. And Scrametti actually does not impact any three of these claims. First, I would like to turn to Section 1557 of the Affordable Care Act. Your honor, we would still argue that the classification here is facial. I understand, and this is probably the third time for some of your honors here in this case, there has been colloquy about whether transsexual is actually just an adjective describing the service as opposed to designating the people who are obtaining the service. Your honor, we maintain that it is actually targeting the people who are obtaining the particular service at issue. If your honors look at JA 1152 to 1153, it lists all of the exclusions contained within this program plan. And of all of those exclusions, this exclusion stands out because it doesn't describe any particular service, but rather a broad category of services because of who attains it. It doesn't describe a surgery or weight loss program or optometry services. It refers to the people who attain it. And the use of the language is very specific. It doesn't describe a diagnosis. It doesn't describe the description of a condition or what the service would be, but rather the who it would be. But even if the classification can be considered facial- Well, what's the language it uses? It's transsexual surgery. Isn't that the language it's using? Correct, your honor. Transsexual surgery. But that includes- Is the Supreme Court disposed of that type of issue in the pregnancy case? Gadoldig? Yeah. How do you handle that? Well, your honor, we argue that Gadoldig in here is distinguishable, one, because here it actually specifically mentions transgender people by referring to transsexual as opposed to- It doesn't say people. It talks about a surgery. It talks about a surgery in the context of other surgeries like sterilization and LASIK surgery, surgery for obesity. And in other words, it excludes a whole list of surgeries, but at the same time it provides all other treatments for transgender persons. That's correct, your honor, but here transsexual surgery is not a medical term. It doesn't refer to any specific service, right? What we're talking about and the services at issue are historically- How do you say it's not a medical term? Help me understand why. You think, like- I'm not sure I understand that. It's not a diagnostic or procedural procedure that is performed, right? What the exclusion actually is referring to- It says surgery. It says surgery. It uses the word surgery. Yes, but it is referring to a whole host of surgeries. Pardon me? It's referring to a whole host of surgeries. It is referring to breast surgery, mastectomy, hysterectomy, panectomy, vaginoplasty. Is that maybe analogous to a policy that would not cover cosmetic surgery? That refers to a whole host of surgeries. It's not a specific diagnosis, but it's a category of surgeries that wouldn't be covered. Why should that factor into our analysis that they refer to an entire category of surgeries? It's correct, Your Honor, that cosmetic surgery may cover a whole host of procedures as well. Well, it doesn't, so why shouldn't we read this the same way that it's referring to all manner of surgeries that are, one might say, sex change surgeries, I think other policies say, or this one may even say that other places. Yes, Your Honor. Here it says transsexual surgery or sex change surgery, transsexual surgery. Your Honor, I think the use of the descriptor transsexual is indicative of the mindset that went into the drafting of the surgery. What's your evidence of that? Context, Your Honor. And I think this is also why Gedaldig is not instructive in response to Your Honor of how this case should be decided. Here there's ample evidence of pretext. In order to determine whether there's purposeful invidious discrimination, one looks at the totality of the circumstances, at all of the evidence. Here we have the use of the term transsexual, which on its face targets a particular population. We also know, except just stay right there, they provide sexual confirming care of all other kinds that are for dysphoria that are now being used except for surgery. That's the only limitation. So it's hard to say that they're discriminating when they actually provide care for dysphoria. They just don't provide surgery. And they don't provide surgery for obesity, which obviously would reduce medical concerns. That's a difficult situation. Or sterilization or LASIK surgery for the eyes. It seems to me cosmetic surgery, acupuncture. I mean these are all on the list. It's a long list of surgeries that they have determined they can't afford if they're going to provide as much care to as many people as possible. And we have a, you agree we have a reasonable standard here, don't we? Both under Medicaid Act and under the Equal Protection Clause. Thank you, Your Honor. No, we wouldn't agree that it is a reasonable standard. So as I was, I think, starting to presage, it is a whole context of factors that goes into the determination of whether something is protectual. And here, that is but one factor. If I may, I would like to elicit the other factors that when taken as a whole, the totality of them demonstrates that this is purposeful invidious discrimination by proxy. One, there is a mention of the term transsexual. Two, the effect of the exclusion falls exclusively, unlike the other exclusions that Your Honor just listed, on one population. Exclusively, not overwhelmingly, but exclusively. That is an indication of pretext. And, Your Honor, to respond to your earlier question. I didn't ask you. Tell me why Mr. David's confused. Well, I think, Your Honor, we're not arguing that disparate effect or impact is per se showing on its own necessarily a showing of pretext. But here, it is a factor to be taken into account. And I believe both Feeney and several other cases, including Washington v. Davis, make clear that when there is such an exclusive, not just overwhelming, but exclusive effect, that can be a factor to be considered to determine whether there is pretext. So here. Can you just give me, just so I'm sure I understand what they are. What are the other factors that you think sort of add to disparate impact? I take you sort of acknowledge, if all you had was disparate impact, that was the only issue, then you would agree with Mr. David. That doesn't establish pretext or intentional discrimination. But you think we can, do you agree with that? I would say that given the exclusive effect, I would disagree.  So you think it's, let me at least finish, right? So you do think that disparate impact alone is sufficient. In certain circumstances. But assume for a minute that the Supreme Court has told us that's wrong. Just accept that as a hypothetical. What are the things that you think are in addition to, like what would you say, we don't just have disparate impact. We've got A, B, and C. Don't explain them. Just give me the list of what are the other things that you think add on to disparate impact. Certainly, Your Honor. Again, the term, the effect, here, that the rationale- Wait, the term- The term is not sexual. Okay. The effect of the exclusion. But, is that different than the disparate impact? Yes, Your Honor. In what way? I believe that the crafting, the drafting, the fact that it doesn't mention the services at issue, but rather it ties it to a particular population, I think is a separate factor. But if I may just- Can you just help me? I just don't, I'm literally just trying to understand the words. I'm not trying to, I'm really not trying to fight with you about it, but I don't even understand what those words mean. So, like, how about say that for me one more time? Yes, Your Honor. That it doesn't identify procedures? I mean, it talks about surgery, right? The procedures that it's talking about is like a class of surgeries. That's correct, Your Honor. But when you design something, it is an intentional use of the terms that are being used, right? Here, it didn't describe it based on-  What if they called it sex change surgery? Would that change your mind? I think it would shift the balance of that factor, Your Honor. But here- But wouldn't you understand transsexual surgery to be the same as sex change surgery? We argue that that would be another proxy for transgender people. Well, I'm not asking- It would be a proxy. I'm talking about the definition of words now. It seems to me you're suggesting- I mean, they- West Virginia provides care for transgender people who are dysphoric, who have dysphoric conditions. And the only limitation, they say, in that category, they will not provide surgery, transsexual surgery, which I understand, I thought was pretty self-evident, that it just means sex change surgery. Thank you, Your Honor. That is correct. But I think the use of the terms itself is indicative of the mindset and pretext. And, Your Honors, if I may, so we have the terminology, the effect, but I want to add a couple of other factors. Can I just- just to clarify, right? That's actually what it says, right? In one place, it's called transsexual surgery. And in another place, there's a bullet point where West Virginia is enumerating what's not covered, and it says sex change surgery, in parentheses, transsexual surgery. That's correct. So let's look at defined term. So we don't have to argue about what does transsexual mean here. They've defined it for us. Sex change surgery. Yes. And, Your Honor, if I may- How does that factor into your first of- I'm not sure how many pretext factors you're trying to get to here, but the first one is that one. We'd like to get past the first and second. We're stuck on that one. How does that factor in? Your Honor, I think the choice of language matters. And this could have- for example, this could have been crafted in a way similar to, say, the statute in Scrimeti, in which the word transgender is never even used in that statute. Okay, West Virginia wants to exclude surgery where a person's coming in and seeks to change his body from one sex to another. How do you propose they describe that? Your Honor, I would posit that the statute in Scrimeti would be an example of another way to describe it, that it's a less direct reference using less unmotivated terminology. Give me a term that you think is less discriminatory. You think transsexual is discriminatory. I'm suggesting transsexual means nothing more than sex change, and I think Judge Rushing has just pointed out that's exactly what West Virginia has described transsexual to mean. Your Honor, the statute in Scrimeti- That you feel is not discriminatory. Thank you, Your Honor. So the statute in Scrimeti would be an example. There it described a surgery attained for the purpose of treating the distress associated with the misalignment between a person's gender identity and their body. That is the definition of gender dysphoria, but that's another way in which to use terminology today. Is there evidence to suggest at the time this statute was passed that transsexual was viewed in the way that you're suggesting? Because we don't look at the words that were used today. We've got to look at them at the time they were enacted, which is not today. Is there any reason to think that it had some, like, you know, discriminatory content that's sort of distinct from sex change surgery? I would argue that yes, but I don't believe that the record does provide for that inference other than the cultural and societal underpinnings that- The record just doesn't tell us one way or the other. That's correct, Your Honor. But, Your Honor, if I may, just to go briefly, I've made my full time of the other factors. I want to point to the other factors that show that there is pretext here. For example, counsel on the other side for the state argues that, well, this is about effectiveness or medical necessity or even questions about whether this is experimental, as was the case in Scrimeti. But we know that it's not about experimental concerns or whether they're even cosmetic surgery concerns because those exclusions already exist in that list, included at 1152 and 1153. So it wasn't that. And it wasn't cost either. Not only that, but we have unrebutted testimony that it is actually more cost effective to provide the care than not because it actually permits less utilization of other services that actually the state does cover. Say, for example, mental health services. So those justifications just don't hold water given how the list of the exclusions- treatment for dysphoria of all kinds except for surgery. I mean, you say that's an irrational decision? Your Honor, I argue that it is irrational, yes, because I believe it's not a cost effective decision. Well, they say it is. They argue it is. They say that they have to make choices. They can't provide all medical care for all people. They don't have the money for that. And so they provide a long list, a very long list of types of surgeries that they're not going to include. And, I mean, we're talking about sterilization. We're talking about surgery for obesity, which it seems to me is a surgery that if somebody can have his weight reduced, he reduces a lot of risks, medical risks. And you could make the same argument that it's cheaper to do the surgery than to treat all the conditions for somebody who's overweight. And yet these are decisions made by the state that are rationally made. You may not disagree with them. I mean, you may disagree with their choices, but they're not irrational, are they? I believe that the decision with regards to this exclusion is indeed irrationally higher. Did you argue below that this was adopted with discriminatory intent? We did argue that there was. All of the factors that I've elucidated were factors that were actually briefed and argued below and before this court earlier. Yeah, I know it came up. I know it came up earlier, but sometimes we talk about things that actually weren't covered below. The district court obviously only ruled on the ñ didn't rule on intent. And I don't recall seeing that you made an argument about discriminatory purpose. But all of this was argued in battling the justifications, if you will, Your Honor, with regards to the Equal Protection Analysis. But do you agree with the question that you did not argue that this exclusion was enacted with discriminatory purpose below? We did argue that in response to defendants' arguments with regards to the Gold Act, that the Gold Act wouldn't apply. But even if it did, there would be ample showing of pretext. Yes, we did argue that. Can you turn and address why Medina doesn't resolve the Medicaid Act claim? We say all the time that we're ñ you parties can't stipulate to the law. You can't stipulate that a cause of action exists. It's a necessary predicate question for us. And rather than weigh in to the sort of complexities of the Medicaid Act, why doesn't Medina just, like, direct us, particularly at this preliminary injunction stage, to say, not that the district court was, like, a bad actor when it decided. But now that Medina's been resolved, granting a preliminary injunction based on a private cause of action under the Medicare Act is, like, a little bit crazy now. Medicaid Act, I'm sorry. I wouldn't call it necessarily crazy. And, Your Honor, I would also argue that different subsections within 1396A of the Medicaid statute may be rights-conferring and some may not. I mean, I understand that, like, you haven't read this, but, like, if you look at 23 and you look at 10, they have the same directive. They're part of the same plan. They're spending clause. Everything Medina says applies to 23, A23, the same way it does to A10. I mean, I don't ñ it's, like, almost hard for me to imagine what the plausible argument is other than, like, it's Tuesday instead of Thursday that would distinguish this case from Medina. I appreciate that, Your Honor. And I would love for the opportunity to actually brief Medina if the court is so inclined. But I would argue that that argument has just simply been waived. You can't waive a legal predicate, right? That's just not a thing that you can do. Well, Your Honor, actually you can. And we pointed to a couple of ñ whether there is a private right of action is not jurisdictional. We pointed to the bono, for example, Your Honor, from the Second Circuit as well as a case from the Eighth Circuit that argue that in the Connecticut context, that whether a claim is enforceable is not jurisdictional and can indeed be waived. Your Honor, I would further posit that Doe v. Kidd before this court, citing two lurks from the Supreme Court, also was indicative and, in that case, reached the merits assuming that there was private right of action. And did that because, as the Supreme Court explained in lurks, whether there's a private right of action is not a matter of jurisdiction. No, they can forfeit that. I'm not sure they can waive it, but they can forfeit it. But then it's just within our discretion as to whether we wish to address the predicate question or we want to weigh in to the complex statutory interpretation that you're asking us to do. And it is, Your Honor, I understand that it's a matter of the court's prudential decision-making whether to address it or not. Certainly, we think that there are reasons why the waiver doctrine does exist. And at no point, even today, they have argued that they've made an argument that private right of action didn't exist. In fact, Your Honor asked that very question in March of 2023, and defendants is about it even then as well. The reason was at that point, binding Fourth Circuit authority said that there was a cause of action, right? That's what Medina reversed was a whole line of cases from this court that said this very statute has a cause of action. And so pre-Medina, it's not really an argument to make in the Fourth Circuit. Maybe before the en banc, you could have tried to make it, but you certainly couldn't make it to a panel. But post-Medina, right? I mean, we're all here talking about Scrimetti, and everybody's arguments have changed a bit because we have new binding Supreme Court precedent. Well, so too is Medina. That's correct, Your Honor. But at a minimum, we would ask for an opportunity to brief whether particular provisions at issue here are right-conferring or not. We haven't had that opportunity. And in any event, we would argue that there's waiver in Fort Fisher. And I think given the – and I understand that I'm over, so. I'm sure Judge Zima, I'll let you answer my questions. Thank you. But understanding the prudential underpinnings of why there's a waiver doctrine is because it is ultimately – this is a court of review, and ultimately it is the issues presented by the parties that dictate. I'm not sure it's jurisdictional. I think a waiver in Fort Fisher are matters that can be reviewed anyway, but I'm not sure we can create causes of action or recognize causes of action that don't exist. That's another problem. But anyway, why don't we come conclude and have Mr. David conclude. Thank you, Your Honor. We rest on our briefs. Yeah. Thank you, Your Honor. I want to start at the language of the exclusion, and we recognize that the exclusion does use outmoded language, but that was the language that was used at the time. What's the language that's not outmoded? Gender affirmation surgery or gender confirming surgery. Gender affirmation surgery is the language that's used in the inter-qual guidelines. It seems to me that's more confusing to affirm a gender when you're trying to change the gender to conform to the identity that the person has assumed. A person feels uncomfortable in a male body or a female body and wants to change his body to conform to his mental identification. That sounds to me like change, but I'm not sure that the language used is unclear. Maybe today it's more desirable to call it gender confirming or sex confirming. Yes, Your Honor. At the time in 2003, gender dysphoria wasn't even a DSM-5 diagnosis. That didn't exist until 2013. So this was the appropriate language at the time. Now it's more correct to say gender affirming surgery, but regardless, it still refers to the same constellation of procedures that are used to treat gender dysphoria. At that time, it was called gender identity disorder. If we said gender affirming surgery, that wouldn't change it. If we said gender affirming surgery, including and listed every possible procedure, it wouldn't change it because the function of it is the exact same. That's what Scrimeti tells us is important. I wanted to also address the argument that this falls exclusively on one population. That's exactly what Godaldig said wasn't enough, that obviously only women can become pregnant, but the fact that only women are affected by that exclusion did not mean that it was a sex-based discrimination or sex-based classification because it affected women who are pregnant but did not affect women who are not pregnant. We have the same thing here because gender dysphoria and being transgender are separate concepts. Gender dysphoria is a DSM-5 diagnosis, being transgender is not, and this only affects people who are transgender who have a diagnosis of gender dysphoria and who have a treatment recommendation of gender affirming or transsexual surgery. And I also briefly wanted to mention that the reason from 20-plus years ago that this exclusion was adopted doesn't matter. The only question is whether it's reasonable to maintain it now, whether there's a rational basis to maintain it now, and Scrimeti tells us there is. For all of those reasons, we ask that the court reverse. Thank you. Thank you. I want to thank both counsel for your very fine arguments. We'll come down and greet counsel and then proceed on to the next case.
judges: Paul V. Niemeyer, Julius N. Richardson, Allison J. Rushing